We now turn to our final case this morning, 2011-13-26, CEPHALON v. WATSON. The case is CEPHALON v. WATSON. Mr. Stronsky, whenever you're ready. We've now moved into the afternoon, so I'll say good afternoon. Thank you, Your Honor. Good afternoon to you and the panel. My name is Jim Stronsky. I'm from Crowell and Mooring and with my colleague, Jim Suzuki, represent Watson Pharmaceuticals in this case. The technology in this case concerns an improved formulation for oral transmucosal delivery of drugs specifically that are poorly soluble and ionizable. And it purports to solve that problem by using a solid solution to improve the solubility of the poorly soluble drug and to use a buffer to improve the drug's absorption because it's ionizable. The prior art teaches exactly this. And the Halperin reference teaches the same solid solution in an oral transmucosal product. And the Stanley 497, also an oral transmucosal product, teaches the use of a buffer. And in fact, the patent suit admits the use of buffers in ionizable drugs was no. And so they don't claim they invented it. Well, but the response there is that Halperin was referenced in 1995, correct? 1955, correct? That's right, Your Honor. And that while it may have disclosed a solid solution, there was not a particular degree of mixing specified in Halperin. So that's the rationale for throwing that one, for not allowing that to overcome the standard. Yes, and that was a legal error of the courts to reach that conclusion, Your Honor. And let me address that. I'm going to address two things, claim construction and that issue, and I'll do that first. The court acknowledged that Watson had an admission that the patent suit, example two, was a co-melt to make the claimed solid solution using polyethylene glycol to heat it, to melt them, to mix them, and to cool them to make a solid solution. And that's what the invention of example two is. And Dr. Zhang, the inventor, admitted in trial that that is his invention. That is his solid solution, which he testified is mixed at the molecular level. Additionally, Dr. Byrne, who was Cephalon's expert, admitted that that example two from the patent suit is just like Halperin's co-melt. And Halperin teaches the same thing. Halperin teaches to make the co-melt with the same thing. Polyethylene glycol even specifies the molecular weights, which the patent suit doesn't. And it says to put that and the poorly soluble drug in solution to melt them, to cool them, and to grind them into small particles, into tablet in the usual manner, which is what example two does. Maybe I'm not clear, but let me focus you on the concern I have. Maybe that would be more helpful to me. The district court, at least in this regard, she noted your burden, and she said, and this is on Halperin, and whether or not the solid solution is the same. Watson has provided no scientific evidence or testimony regarding the products produced by Halperin's examples. It is unclear, therefore, whether and to what degree the Halperin products are molecularly mixed. He's the fact finder in that regard. She heard all of the evidence. Why is that? She applied the wrong standard, Judge. What she did is she came to that conclusion. If you look at her opinion at A53. I was reading on 54. In any case, what she did is she recognized what I said before in terms of the testimony of Dr. Zhang and Dr. Byrne, and transitively that prior art was the same thing, because it was the same example, and it does disclose the same example. The court can look at it and see it is the same thing. And she said, however, Dr. Byrne testified that the concept or the understanding that the Halperin solid solution disclosed in 1955 was molecularly mixed wasn't understood, wasn't appreciated until 1970s, and that's the wrong legal standard. That's a legal error. The issue is not what was understood in 1970, not what was understood in 1955, but what was understood at the time and what it would teach an inventor or a person of ordinary skill at the time of the invention, which is 1999. And I submit that here all we have is we have the inventor in 1999 describing how the Halperin solid solution works, but it's the same solid solution that's disclosed. And if you look at the examples, you can tell that. And that understanding or description of how it works doesn't make it patentable. It's no different than if in 30 years we would have more of a greater understanding about the subatomic particles in the solid solution and how they might help solubility. That would not make the 1955 Halperin reference any more patentable in the same product. And so I think there's a legal error here. I understood her analysis to be her consideration of whether Halperin disclosed a solid solution if that term was used in 1999, not necessarily in 1955. Am I wrong about that? So if I'm right about that, then I'm not clear on what was wrong with the standards. And so the court can look at that. And you can see that that's clearly Erania's. If you look at what she says, though, she's focusing on when it was appreciated and when it was understood. So to us, it seems like she's applying the wrong standards. She's not applying to the wrong legal standard. There's no basis. They don't contend that Halperin is not intellectually mixed. At most, they don't take a position as to what it is. But it's no different than example two. And so if you just, you know, I'd suggest that maybe we could turn to claim construction now. Sure, sure. Claim construction, Your Honor. Thank you very much. Claim construction. Watson, below and here, takes the position that solid solution excludes things that are not molecularly mixed, which were understood to be solid dispersions. If you look at the specification, and we think this case is much like the retractable technologies case, the Verbeck and Dickinson case. Can I just step back a minute for your whole argument? Because I found it a bit confusing in the briefs in terms of what you were actually arguing. It seemed to me at the end of the day, and this is how I understood it, so tell me why I'm wrong, that you really have two arguments. There's a solid dispersion argument that goes to whether or not there are clusters or not clusters. And then it seems to me you're also pressing a completely separate and distinct argument about the 15% versus minuscule, whatever that wants to be, but except what, to what extent there has to be solid solution. Am I right about that, that those are really two different arguments that you're pressing? There are two parts of the same argument. But they're different, right? I mean, they're entirely different. Dispersion goes to whether or not there were clusters, and the second portion goes to what percentage of this was solid solution and what percentage may have been acquired. Am I right about that? Yes, but I think they can be analyzed differently, but they are related because what the court did is it said that a solid solution can include any amount of material that's not molecularly mixed. It doesn't specify. It includes solid dispersions. It doesn't specify how much. So you can have two molecules that are molecularly mixed, and the rest is just mixed. And you can have that in a quantity which is minuscule as compared to the rest of the drug, which is not mixed at all. And that would be covered by this construction, and that's not what the specification requires. We argued below. We argue here that it requires that everything is molecularly mixed. So that's separate and distinct for the dispersion argument, or not? Yes, yes. A dispersion is not a solid solution, and that is how this inventor explains his invention. He says, and specifically, he says, the present invention provides a number of advantages over the prior art formulations. Solid solution formulation comprises a pharmaceutical agent and a drug capable of being delivered via the oral mucosal membrane and a dissolution agent capable of being mixed at the… Well, let me ask you, leaving aside for a moment the solid dispersion, on the second point you're making on the formulation, whether some quantity, however minuscule of the drug, is in solid solution, that issue wasn't one that was pressed during claim construction, was it? I mean, nobody, you weren't proposing that all of it has to be in the solid state, and the other side wasn't countering that any amount is sufficient. The other side was focused on that because the claim construction was done. I think this is the reason. Claim construction was done at the end of a year after the trial. It was done at the end of the trial. So we didn't have claim construction going into the trial, but we did present that there was no proof. We did two things. Claim construction requires that it all be molecularly mixed, and there's no proof that there's anything molecularly mixed. We still believe that. I'm not going to argue unless you have questions. Okay, that's claim construction. I appreciate that. But then on my point, what portion is in solid solution, however minuscule the quantity? Right, and so I'm not sure I understand your question, Your Honor, but we think it's erroneous to analyze that that demonstrates the claim. There's really two issues. Claim construction is erroneous to include solid dispersions, and then additionally to say that that overbroad construction can be present in a minuscule amount does violence to the public notice function of the specification. Nowhere is a teacher has suggested, and it's not what the invention is about. So on claim construction, what I'd like to do is just make the point that I think this is similar to the court's July decision in retractable technologies, where the court analyzed a claim term body and said that body has to be understood in view of the specification to be a single unit body. And that was because that single unit body was a way the specification distinguished the invention over the prior art. It was also the only way it was described in the preferred embodiment, and when I talked about the invention, it described it that way. And the same is true here. I read from column six on A64 the distinguishing of the prior present invention over the prior art based on it being molecularly mixed. It also says on column eight, A65, line 65 to column nine, four, that it's mentioned earlier the drug and dissolution agent in the form of the solid solution are mixed at the molecular level. And this is in connection with a paragraph about the present invention. The dissolution agents are usually selected based on- And as you saw, Mr. Lee on the other side came back with that and pointed to words like usually and so forth to demonstrate, to try to weaken your argument with respect to that. Right, right. You have a response to what he said. And my response to what he says, I think he relies on comprisingly, and comprisingly here would allow you- Certain words in that provision you were talking about starting at 64, like dissolution agents are usually and some other terms than this. I didn't, but in any event, go ahead. Right. And so we think if you look at the particularly distinguishing of the present invention from the prior art, and you look how this is used entirely with the specification, there's no teaching, there's no enablement, there's no description of anything other than the drug and the solid solution being entirely mixed molecularly. And why? That creates the benefits of the invention, the objects of the invention that are in column five. You don't have them unless you have that. The pending claims in suit here, which are claims five and 54, claim five requires a physical barrier between the drug and the buffer. Claim 54 requires literally a solid solution microenvironment, which is segregated from the pharmaceutical agent, which again is the buffer. Unless the drug is all in solid solution, you don't have that. If you have her construction on infringement, you have some portion unstated in solid solution, the rest just mixed. And then that can represent only a minuscule amount of the formulation. And so you don't have any of the benefits of the invention. It's clearly not what the invention requires. And this is one of those cases where you're not importing limitations from the spec, you're looking at the spec and the spec tells you what the invention is. And I see my time is up, Your Honor. Do you have any questions? Reserve the rest. Thank you. We'll reserve. Will we store a couple minutes to. Please report. My name is Bill Lee and together with my partner, Mark Fleming, I represent Cephalon. Let me move directly to the issue of obviousness, which was the first issue that Mr. Stronsky addressed. And as I understand their position now, there are really two principal arguments and obviousness, one of which goes to all the claims and one of which goes to claims five and 54. And I'd like to address the first first, which is the obviousness argument you discussed with Mr. Stronsky. Now, these are all based upon factual findings that the district court made after hearing the testimony of the competing experts, looking at the documents and reaching her factual findings on the issues underlying the legal determination of obviousness. So let me take the first one. And the first one relates to Halpern and the solid solution limitation that Judge Post talked to Mr. Stronsky about. And the starting point is this. At page five, page 12 of the reply brief, Watson concedes, and I quote that Halpern is silent on molecular level mixing. And on this issue, Watson is correct and we fully agree. The 1955 reference says nothing about the kind of solid solution that's claimed in Cephalon's patent. Yeah, but his point in that sentence even is that going to the point he made this morning about the district court was applying the wrong standard. He says what's critical in 1999, someone would have looked back and reasonably expected Halpern to have formed molecular molecularly mixed solid solution. So that's his point. That's his point, Your Honor. And that's why in their brief queue, they now have a new obviousness argument. They never gave a district court a chance to rule. They now recognize that Halpern itself does not disclose a solid solution as claimed. It has the words nothing more. They also recognize now that Judge Robinson's factual finding at page 854, which Your Honor quoted, which is they have not proven by clear and convincing evidence or any other standard that there is a solid solution as claimed is a problem. So there's a gap fill and there's a gap fill on appeal. It's an argument that was never made below. And here's what it is. It's the argument presented to you that you should combine three references. You should combine Halpern, Stanley, and Riegelman. And Riegelman is the later reference that would wind the clock forward and make Halpern what they say it is. That is an argument that's flawed both procedurally. Is Riegelman the 71 reference? Yes. And Your Honor, this is an argument that I would suggest is flawed both procedurally and subsequently. Procedurally because they never made it below. They put a invalidity expert on the stand. He didn't read a word about Riegelman. There was no suggestion of that combination. The district court, as a consequence, never had a chance to consider the argument that you're being asked to consider on a clear error standard. But even if I set that aside, if the argument is properly made, the evidence is not there to make the argument. This is really attorneys arguing about what references not before the district court on this issue say. Riegelman doesn't mention Halpern. Riegelman doesn't tie Halpern to 1999 or otherwise. And most importantly, because they didn't present it, no one got on the stand and said, OK, you take Halpern and you take Riegelman and you take Stanley. There is a reason to combine them. There's a motivation to combine them. And you have a reasonable prospect of getting what is claimed. There's nothing— They say that Riegelman was raised by your witness, but you say it was referenced by your witness, but it wasn't presented as part of their case. Yeah, and this goes back to something that came up in the first argument today. It's true that Riegelman was offered by us as background on the technology. It was never raised by them as a prior art reference that would invalidate claims. And, Your Honor, it's because of the fact that Halpern and Stanley combination doesn't do it that you're getting this argument on Riegelman. And then you might ask, well, why doesn't Halpern and Stanley do it on the record that was before them? And I want to go to the two arguments that Mr. Stronsky made because I think they're both incorrect. But more importantly, the district court made factual findings on them that are not clear error. And the first one is his contention that the examples are the same, that the example from Halpern is just like the example in the patent. And there's a chart, Your Honor, page 39 of their opening brief and the blue brief. And that chart has Halpern example one side by side with example two of the patent. Now, you'll notice four things about this chart. The first thing is there is no citation to any record evidence where anybody of skill in the art or an expert got on the stand and said these are the same. And there's a reason for that. You will see that the pharmaceutical agents are different. They're not even the same. You will see that one of them has a process condition of temperature. The other has nothing. You will see that one has a molecular weight of polyethylene glycol. The other does not. The agents are different. The processes are different. It's not a coincidence that Judge Robinson made the finding at age 54 that there simply is no proof these are the same. So what do they do? Again, gap fill. They cite to you two pieces of evidence. And they say this is sufficient to show you that they're the same. And at our brief, in our red brief at page 28, we quote for you the testimony. It's a testimony that Mr. Stronsky just said. It's testimony from our expert that said these two examples are the same. And we quoted it specifically, Your Honor, because I think the transcript answers the question. If you look at this testimony, it's at least confusing. And the critical question, which is at the bottom of page 28, an answer, the critical question is asking two questions. And the answer we say is answering the first. They say it's answering the second. But the most important thing is this. The district court was there watching this testimony come in. She specifically addressed the contention that this was the gap filler that made that chart make sense. And she did not accept that. That's not only a factual finding. It's a credibility finding. And so that's why you have the situation of Halpern-Stanley doesn't do it. The testimony of Dr. Byrne and the side-by-side comparison of examples doesn't do it. So that's when you get the argument of Riegelman and Halpern and Stanley. They don't work collectively, both procedurally and substantively. Now, the second obviousness argument, Your Honor, goes specifically to claims 5 and 54, which have a separate requirement that the buck be segregated or physically separate. And this, again, is a place where Watson's claims are a bit of a moving target, even on appeal. In their opening brief to you, they said, Stanley provides the buck. Stanley provides the buffer that improves absorption that's claimed by the claims. We came back in our brief and said, well, that can't be because the buffer has to be separate or physically segregated. And Stanley explicitly says you mix everything together. And it's homogeneous. It's all the same. And in fact, the uncontradicted record before Judge Robinson was Dr. Byrne's testimony that Stanley was a homogeneous mixture where everything's the same. So on reply, we have a new argument, not really one that was pressed with Judge Robinson. And what is the new argument? The new argument is what Dr. Flanagan said. It might be segregated in Halpern, not Stanley now, in Halpern. It might be segregated. It may be segregated. Halpern might do it in Example 5. Not true. Halpern Example 5, which is the only one they rely upon, is the only example that doesn't have pooling before the addition of the buffers. By definition, it's one that read fairly is more like Stanley than it is anything else. That's the reason that there wasn't this proof below. If I could go to the issue of claim construction, but also the issue that you inquired about, about these two things, because I do think it's hard to quite figure out what their position is. If you take the claim construction position, we would just ask the court to compare it to what they said to the district court at Appendix 4154. Because there, they took a position with her honor below that near as I can tell is the exact contrary of what they're saying today. Quote, Watson's construction of solid solution does not rule out small clusters of more than one molecule. That's the express representation they made to her below. I think there are two things, and there are actually two separate issues. First is, is her claim interpretation incorrect? Her claim interpretation that says a solid solution requires molecular mixing. And we would say these three things. One is, the patent specifically refers to molecular mixing without identifying a degree or that it has to be every molecule. She was correct on that. Patent specifically says comprising. It's not words in the specification. It's in the claims. And she was correct to find that some amount, you could have some other things there, but it didn't have to entirely be molecularly mixed. And the third thing on the claim construction issue is that specification in every single place refers to molecular mixing. And in every single place where it refers to the benefits of the invention, describes it in a manner consistent with her claim interpretation. This issue of minuscule or the amounts, Your Honor, that actually, that's a portion of her opinion when she's discussing infringement. And the sentence that immediately follows that, however minuscule, says Watson hasn't given us any proof of what's in that. Let's stay with the sentence, however minuscule. Is that a correct statement of the law or is it not? Your Honor, it's a correct statement on this record. It is correct on this record for this reason. She had her claim interpretation. She then applies her claim interpretation to the facts before her. The facts before her are this. Dr. Byrne, and she found this, Dr. Byrne at Appendix 6103 said the 85% is entirely solid solution. She said that without equivocation. Dr. Metzger gets up and says, as she finds, I'm not going to give you an amount, right? I'm not going to give you an amount. I'm not going to tell you how much solid solution is in there. I'm just going to tell you it could be other things. And what she says is the following. I have one expert witness who has done the test, two different variety of tests. Based upon those tests, I've watched him testify and he says that 85% is solid solution. I have another who says I'm not going to give you a number, but it could be this. It could be that. But then what she does is she goes a step further and says, well, he says it could be amorphous. But the record establishes that after two and a half years of sitting on the shelf, looking at the manner in which it was manufactured, it couldn't be amorphous as a scientific matter. Therefore, Dr. Bates' testimony is more credible, and she specifically finds it to be more credible than Dr. Metzger's. In that context, her saying, and it's not necessary to her finding that the claim would cover something, however minuscule, is not necessary to her finding. It's not incorrect. Isn't her finding that there's some solid solution? And I think the problem is she was grasping with all of this, and she couldn't point to anything specific to say this is the percentage of solid solution. So she was forced into a determination that even if it's minuscule, it's sufficient. I don't think it was quite that far, Your Honor, for these two reasons. What's wrong with however minuscule? Let's assume I have a patent on a compound, and your client manufactures a different compound for a different version, but they put a little bit of my compound in their compound. It's just a dab. It's just a dab, and it gives you the benefits of the invention. Now, I can hypothesize. That was the point. The benefits of the invention is the statement that your friend ended with because his argument was that none of the benefits of the invention would emerge with a minuscule amount. Well, Your Honor, we know this. We know that they have an end of product. We know that their end of product is going to be just like our branded product. We know, therefore, they're going to get the benefits of the invention, which is greater absorption, greater dissolution, and improved stability. So, Your Honor, I think this is in part the answer to Judge Clevenger's question. Could someone have asserted that at the claim construction matter, there are limitations that might be added to ensure that you get the benefits of the invention? That has come up in some cases before. No one suggested that here. In fact, by saying a minuscule amount wouldn't do it, and so you've got to have more than a minuscule amount for a claim construction. Yeah. You have to have put the issue to her and said the claim requires some specific amount, or alternatively, you have to put it to Her Honor by saying, Your Honor, on this record, the amount is so small, right, that you could not achieve the purpose of the invention. You've got the burden here, not them. I mean, it's an infringement issue, so the burden was on you to establish infringement, not on them to say it wasn't sufficient. That's true, and she found that we did, and the question is, did she commit clear error in finding what we did? And I would ask you to compare, and I'm over time. No, please continue. Let me finish this thought. I would ask you to compare her finding with the testimony, A6103, testimony that she credited, and it is this black and white, referring to the 85%. In my opinion, the rest of the API, that's the 85%, is formed in solid solution. Thank you, Your Honor. Thank you. Thank you, Your Honor. At a minimum here, I think the claim construction needs to be corrected, and on this record, if you find that a minuscule amount is not … Well, wait. The claim construction needs to be corrected. Are you advocating, does that mean that you want us to adopt your original claim construction or something more now? No, our original claim construction, that it all must be mixed at the molecular level. What he cited to before, and I would just ask the court to look at it carefully, we didn't waive this issue. We argued before that molecular mixing, that the parties had essentially the same definition of what mixed at the molecular level was. But we said, to be a clear judge, what matters is and what is different is that we exclude things that are not mixed at the molecular level. It all must be mixed at the molecular level, and the judge understood that, and she disagreed with us. But the result of that is that now a minuscule amount infringes, and judge, you don't get the benefit of it. So there was the 85% versus the 15%. So you're not arguing that it has to be 100% now. You're just saying it has to be something more than minuscule. Where would you draw the line? We're agreeing on 100% because we've already kicked out 15%, right? Right, right, judge. So you can, with a comprising claim perhaps, and this is not that situation, you could have some other active ingredient in here, but it wouldn't make sense with a product that's immediately released like this, that's delivered this way. But let's stick with the 85%. You could have something else that was present, another active ingredient, but you would have to have in that 85% the drug that is the subject of the invention. The invention here is a solid solution. It's not a solid solution in part. It's not a solid solution in minuscule. It's not a solid solution. And so, judge, this is different than the case where – So can you just try to answer my question before you – I'm sorry, yes. – have the judge come in, which is, so what portion of – we've already established it's not 100% because we've been willing to kick 15% out. Right, right. So you're left with 85%. Where are you drawing the line? You said minuscule isn't sufficient. What is sufficient between zero, minuscule, and 85%? Yeah, 85% might be sufficient, Your Honor. And I think 100% certainly would be sufficient. Well, yeah, okay. Anything less than 85%? The patent doesn't teach a person of ordinary skill where it would be. And so there's no suggestion. But I think – And there was no claim construction dispute of where that line would be. You didn't propose a claim construction dispute. In essence, we did. We said all. We said all must be molecularly mixed, and that is a clear position. There was no basis for us to say 50% or 20% or 75%, and that's why this patent is so simple. The invention is not an intermediate that may be found inadvertently in somebody's product that is claimed. This is a formulation patent, which has certain benefits, and a person of ordinary skill is going to understand when you achieve those benefits if your drug is in solid solution with the dissolution agent. If it isn't, you don't. Clevenger. Yeah. And so we think that's different there. We don't have a second – and I think there's some confusion on the record, perhaps, based on the argument. We don't have a second or new invalidity argument. What happened here is Halpern – I'm going to try to say this concisely because your time is running out. Okay. Halpern and Stanley give you all you need under KSR to find it invalid. We have ample testimony that there are only two places you can put the buffer, extra-granularly or intra-granularly. And that's the main issue, I think, one of the main issues. And KSR tells you that that alone, where you have two choices, it would be obvious. And we have testimony from Dr. Flanagan, unrebutted, that you would put it outside because you don't want to complicate the solid solution. Thank you, Your Honor. Appreciate it. Thank both counsel. This is significant.